UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
03 JAN 27 PM 2:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

KEITH EDWARDS, )
)
Plaintiff, )
)
vs. ) Civil Action No. CV-01-S-2525-S
)
UNITED PARCEL SERVICE, INC., )
)
Defendant. )

**ENTERED**

JAN 2 7 2003
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**MEMORANDUM OPINION**

Plaintiff, Keith Edwards, who is an American citizen with African ancestors, claims that United Parcel Service, Inc., terminated his employment because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The action now is before the court on three motions, all filed by defendant: a motion for summary judgment; a motion to strike portions of plaintiff's declaration; and a motion to supplement the affidavit of David Brandon.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).



> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment should be granted. Further, because it was not necessary to address defendant's motions to strike and to supplement the affidavit of David Brandon, they are denied as moot.

## I. SUMMARY OF FACTS

Plaintiff was first employed by United Parcel Service ("UPS" or "defendant") in July of 1993, working part-time at its Northeast Roebuck Center located in Birmingham, Alabama, loading and unloading parcels, as well as washing so-called "package cars,"[1] which are the ubiquitous brown vehicles that defendant operates to deliver many of its parcels. During June of 1994, plaintiff began working for defendant in the capacity of a part-time "cover driver," which required that he drive the delivery route for package car drivers who were absent from work.[2] Defendant employed three classifications of package car drivers: (1) "bid drivers," who drove the same route every day; (2) "cover drivers," who were part-time employees that substituted for absent bid drivers; and (3)

---

[1] Defendant's evidentiary submissions (Edwards deposition), at 21-27.
[2] *Id.* at 31-32.

"unassigned drivers," who performed exactly the same duties as cover drivers, but on a full-time basis.[3] Plaintiff was promoted to the position of "unassigned" package car driver in July of 2000.[4] He worked in that capacity until his employment was terminated a few months later, on October 19, 2000.[5]

### A. Duties of an Unassigned Package Car Driver

Upon reporting for work at the beginning of each shift, unassigned package car drivers were issued a small handheld computer called a "DIAD" (an acronym for a "Delivery Information Acquisition Device"), which contained the driver's route for that day. The driver then would go to the pre-loaded package car that had been assigned to him and "sign on" the DIAD by entering his name, driver number, package car number, and the package car's starting mileage (the odometer reading). The driver then embarked on his route, delivering and picking-up packages. Throughout the day, the driver was required to enter additional information into his DIAD to document package pick-ups and deliveries, the receipt of money, lunch breaks, and other events. At the end of his shift, the driver would return to the distribution center, park the package car, unload any undelivered packages, and enter the package car's ending mileage (the odometer reading) into his DIAD.[6]

Defendant is "totally dependent" on its package car drivers to accurately enter information into the DIAD units.[7] Accurate data entry is crucial to the efficient operation of UPS's business. Accordingly, every package car driver is told that he is responsible for the accuracy of the information that he enters into his DIAD. Defendant characterizes the falsifying of information

---

[3] *Id.* (Brandon affidavit) ¶ 2.

[4] *Id.* (Edwards deposition), at 42.

[5] *Id.* (Edwards deposition) at Tab 16 (EEOC charge).

[6] Defendant's evidentiary submissions (Brandon affidavit) ¶¶ 3-5.

[7] *Id.* ¶ 6.

input into a DIAD as not only an act of dishonesty, but a "cardinal sin," which cannot be tolerated.[8]

## B.     Plaintiff's Termination

On September 26, 2000, plaintiff's supervisor, Walt Nixon (who also is an African American), inspected plaintiff's package car and determined that he had not "service crossed" several parcels. A "service cross" is handwritten on the outside of an undelivered package, and details when the driver attempted to deliver that package and why it was not delivered. When Nixon saw that plaintiff had not "service crossed" some of the parcels in his package car, he concluded that plaintiff did not attempt to deliver those packages. The next day, Nixon discovered that the odometer readings plaintiff had entered into his DIAD were not correct.[9] Nixon states that he counseled plaintiff regarding his failures to follow standard UPS procedures, and told plaintiff that he would receive a letter of warning. Plaintiff denies that this counseling ever took place.[10] Nixon then reported his findings to David Brandon (a Caucasian), who was Operations Business Manager for the location where plaintiff worked, and, Nixon's immediate supervisor.[11]

Brandon then contacted his supervisor, Lynn Ard (Caucasian), and explained that he believed plaintiff was recording inaccurate odometer readings on his DIAD. Ard and Brandon then consulted Emery Brawley (Caucasian), who was the District Labor Manager for the local union. Brawley advised Brandon to investigate further into the accuracy of plaintiff's mileage recordings, and then

---

[8] *Id.*

[9] Defendant's evidentiary submissions (Nixon deposition), at 26. Nixon also testified that plaintiff did not record the undelivered packages in his DIAD, as required. Plaintiff claims that he *did* record the undelivered packages in his DIAD, but forgot to "cross mark" them. *Id.* (Edwards deposition) at 70-72. Defendant argues that, even though one of the two facts discussed in the text preceding this marginal note is disputed, the disputed fact (*i.e.*, whether plaintiff actually recorded the undelivered packages in his DIAD) is not material to adjudication of this action. This court agrees.

[10] Defendant's evidentiary submissions (Nixon deposition) at Exhibit 5 (Nixon file memo Sept. 27, 2000); plaintiff's evidentiary submissions, Tab 1 (Edwards declaration) ¶ 7.

[11] Defendant's evidentiary submissions (Nixon deposition) at 46; defendant's brief supporting summary judgment, at 5; (Brandon affidavit) ¶ 7.

act based upon whatever that inquiry revealed. Because plaintiff had recently missed two months' work due to a back injury, Brandon decided to scrutinize the data that plaintiff submitted over the next two weeks for discrepancies.[12]

Since plaintiff worked as an unassigned package car driver, he often changed vehicles and routes. Thus, Brandon checked the accuracy of plaintiff's odometer inputs by comparing the numbers that plaintiff entered with the numbers entered by the driver(s) who operated the same package car the day before and after plaintiff. If plaintiff drove the same vehicle the day before, Brandon would simply compare the numbers that plaintiff entered on two adjoining shifts. Brandon's inquiry revealed that plaintiff incorrectly recorded the odometer reading on his assigned package car on nine of the sixteen days that his records were checked. A summary of the discrepancies is set forth in the following table:[13]

| Date | Package Car No. | Ending Mileage from Prior Shift | Mileage Plaintiff Recorded at Beginning of Shift | Mileage Plaintiff Recorded at End of Shift | Beginning Mileage Recorded the Next Shift | Net Disparity |
|---|---|---|---|---|---|---|
| 9/26/00 | 100406 | 70460 | 70438 | 70538 | 70535 | +25 miles |
| 9/27/00 | 116968 | 60121 | 60121 | 60170 | 60160 | +10 miles |
| 9/29/00 | 110930 | 135353 | 135351 | 135411 | 135411 | +2 miles |
| 10/3/00 | 100406 | 70794 | 70764 | | | +30 miles |
| 10/4/00 | 100406 | 70835 | 70764 | | | +71 miles |
| 10/10/00 | 116968 | 60491 | 21445 | 21513 | | unknown |
| 10/11/00 | 116968 | 21513 | 60529 | 60585 | 60569 | unknown |

---

[12] Defendant's evidentiary submissions (Brandon affidavit) ¶ 7; (Edwards deposition) at Exhibit 5 (Edwards injury report Aug. 8, 2000) and Exhibit 6 (Edwards injury follow-up Sept. 26, 2000).

[13] Defendant's evidentiary submissions (Brandon affidavit) ¶¶ 8-9; (Edwards deposition), at Exhibits 9-15 (Edwards time cards).

| 10/16/00 | 108489 | 95575 | 95565 | 95640 | 95641 | +9 miles |
| 10/18/00 | 108489 | 95695 | 95675 | | | -20 miles |

After considering the preceding information, Ard, Brawley, and Brandon concluded that plaintiff was intentionally and dishonestly "padding" his mileage.[14] At Ard and Brawley's direction, Brandon met with plaintiff and his union steward on October 19, 2000, and terminated plaintiff's employment.[15] Plaintiff first filed a grievance, pursuant to the terms of his union's collective bargaining agreement.[16] When that grievance was denied,[17] plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging race discrimination.[18] The EEOC issued plaintiff a notice of his right to sue on July 15, 2001, and he filed the current action on October 9, 2001.[19]

## II. DISCUSSION

Plaintiff's sole claim is that defendant fired him because he is an African American.[20] Plaintiff presses his claim pursuant to both Title VII and 42 U.S.C. § 1981. It is well established that racially-disparate treatment claims brought under these statutes have the same substantive proof requirements and analytical framework; accordingly, this court will examine plaintiff's Title VII

---

[14] Defendant's evidentiary submissions (Brandon affidavit) ¶ 10.

[15] *Id.* (Brandon deposition), at Exhibit 1 (Brandon file memo Oct. 19, 2000); defendant's brief in support of summary judgment, at 7.

[16] Defendant's evidentiary submissions (Edwards deposition), at Exhibit 8 (transcript of union hearing of plaintiff's grievance).

[17] *Id.*

[18] Complaint ¶ 2.

[19] *Id.* ¶ 3.

[20] Plaintiff's brief opposing summary judgment states that he "seeks to maintain a claim of intentional discrimination in employment based upon race . . . related to the termination of his employment. . . ." Plaintiff adds that he "does not seek a separate judgment or award for unlawful terms and conditions of employment. [Plaintiff] cites adverse terms and conditions of employment visited upon himself and other black employees as background circumstantial evidence of racial animus on the part the primary decision maker, David Brandon." Plaintiff's brief opposing summary judgment, at 1.

-6-

claim "with the express understanding that the analysis applies with equal force to his Section 1981 claim." *Curtis v. Teletech Customer Care Management, Inc.*, 208 F. Supp. 2d 1231, 1240 (N.D. Ala. 2002); *see also, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1109 n.4 (11th Cir. 2001) (quoting *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context.").

Plaintiff does not present direct evidence of defendant's alleged discriminatory animus. Thus, he must prove his claim with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Under this analysis, a plaintiff must first establish a prima facie case of disparate treatment, which creates a presumption of discrimination. The employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that defendant's proffered reason is merely a pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 802-05, 93 S. Ct. 1817; *Burdine*, 450 U.S. at 252-256, 101 S. Ct. at 1089.

### A. Prima Facie Case

The Eleventh Circuit recently held that a plaintiff seeking to make out a prima facie case of disparate treatment discrimination in the termination of employment "must generally show that[:] (1) plaintiff is a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) the employer treated similarly situated employees outside of the protected class more favorably;

and (4) plaintiff was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1817; *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)).

### 1. Comparators to plaintiff

The parties dispute whether plaintiff has identified any similarly situated employee outside his protected class who was treated more favorably than he. The following is a concise summary of the Eleventh Circuit's guidance on what is required to show that two employees are similarly situated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999). Thus, plaintiff must show that employees outside his protected class were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways. *Id.*; *see also, e.g., Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed.").

Plaintiff asserts that he has identified two Caucasian co-workers who engaged in misconduct similar to his, but received less severe punishments: Rollo Rollins and James Pat Wood.

### a.  Rollo Rollins

Rollins' misconduct was that, *on one occasion*, he delivered a *Federal Express* package to his neighbor and recorded it on his DIAD as a UPS delivery. Defendant then terminated Rollins for dishonesty, but later reinstated him through the collective bargaining agreement grievance process. Rollins and plaintiff are not similarly situated because there is a clear difference in the *quantity* of their misdeeds. *See Maniccia*, 171 F.3d at 1368. Rollins was found guilty of falsifying one entry into his DIAD, while plaintiff was found to have falsified ("padded") his odometer readings *at least nine times in less than a month*. Such a difference is certainly not "nearly identical," and Rollins and plaintiff are not similarly situated. *See Silvera*, 244 F.3d at 1259 ("[A]lthough Silvera and Ritter have in common the fact that they were arrested in the 1970's . . . Silvera has three additional arrests . . . . The fact that Silvera had multiple arrests is by itself sufficient to establish that he is not similarly situated to Ritter."); *Maniccia*, 171 F.3d at 1368-69 (holding that a female plaintiff in a Title VII sex discrimination case was not similarly situated to male employees who each committed a single policy violation, whereas the female plaintiff had committed at least four policy violations); *Jones*, 137 F.3d at 1312-13 (holding that employees who allegedly committed one act of misconduct were not similarly situated to the plaintiff, who engaged in multiple instances of misconduct in the same day).

### b.  James Pat Wood

Wood was terminated for "just cause" by defendant for "workplace violence, service sabotage, and gross insubordination."[21] After negotiating with the union, however, defendant agreed to reduce Wood's discharge to three eight-day suspensions, because Wood did not receive any letters

---

[21] Defendant's brief in support of summary judgment, at 18; defendant's evidentiary submissions (Brawley affidavit) ¶ 2.

of warning prior to his discharge, as required by Article 52 of the collective bargaining agreement. In pertinent part, Article 52 provides that:

> The Employer shall not discharge nor suspend any employee without *just cause*, but in respect to discharge or suspension shall give at least one (1) warning notice of a complaint against such employee to the employee, in writing, and a copy of the same to the Local Union, *except that no warning notice need be given to an employee before discharge if the cause of discharge is dishonesty*. . . .[22]

Thus, the terms of the collective bargaining agreement mandated Wood's reinstatement, because he did not receive a letter of warning prior to his discharge for "just cause." Conversely, the collective bargaining agreement did not require that plaintiff's discharge for "dishonesty" be preceded by a warning notice. The provisions of Article 52 serve to illuminate the fact that Wood and plaintiff are not similarly situated, because the *quality* of their misconduct is not "nearly identical." *Maniccia*, 171 F.3d at 1368. Plaintiff was terminated for dishonesty, while Wood was terminated for "just cause," stemming from unspecified incidents of "workplace violence, service sabotage, and gross insubordination."[23] Because the grounds pursuant to which they were terminated are not "nearly identical," Wood and plaintiff are not similarly situated. *Id.*

"Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998) (holding that "a Title VII plaintiff cannot succeed in proving that [he] was intentionally discriminated against if [he] does not establish a prima facie case of discrimination"). Even looking beyond the prima facie case, the record reveals no evidence from which a reasonable juror could infer that plaintiff's employment was terminated because he is an

---

[22] Defendant's evidentiary submissions (Brandon affidavit), at Exhibit A (Article 52 of collective bargaining agreement) (emphasis supplied).

[23] Defendant's evidentiary submissions (Brawley affidavit) ¶ 2.

African American. Accordingly, plaintiff's disparate treatment claim is due to be dismissed.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted as to all of plaintiff's claims. Defendant's motion to strike and its motion to supplement the affidavit of David Brandon are moot. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this **27th** day of January, 2003.

_____
United States District Judge